IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                           )
**DAVID N. KAPLAN**                 )
**3001 Park Center Drive, #515**     )
**Alexandria, VA  22302,**           )
                                           )
             **Plaintiff,**         )
                                           )
       v.                       )       Civil Action No. 1:05CV01419 (GK/JMF)
                                           )
**CARLOS M. GUTIERREZ**      )
**Secretary**                         )
**United States Department of Commerce**  )
**Room 5516**                     )
**14th and Constitution Avenue, NW**   )
**Washington, DC  20230**          )
                                           )
             **Defendant.**        )
_____)

## AMENDED COMPLAINT

Plaintiff, David N. Kaplan brings this amended complaint against Carlos M. Gutierrez, Secretary of the United States Department of Commerce ("Defendant"), in his official capacity and alleges as follows:

## BACKGROUND AND PARTIES

1. This civil action arises under the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 791 et seq.

2. The Plaintiff is David N. Kaplan, a United States citizen and a resident of Alexandria, Virginia. From February 14, 2000 through February 9, 2001, Plaintiff was employed by the Defendant in the Office of the Deputy Under Secretary ("DUS") for the National Oceanic and Atmospheric Administration ("NOAA").

3.      The Defendant is Carlos M. Gutierrez, Secretary of the United States Department of Commerce ("DOC"), which is a federal agency that includes DUS and NOAA, and is located in the District of Columbia.

## JURISDICTION AND VENUE

4.      This Court has jurisdiction over the claims in this action pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343.

5.      The great majority of the actions complained of occurred in Washington, DC. Venue is therefore proper in this Court pursuant to 28 U.S.C. § 1391(e).

## FACTS

6.      Mr. Kaplan is an individual with a disability. He has achondroplasia, a form of dwarfism. In addition to short stature, this condition causes short arms, splayed fingers, breathing difficulties, hearing loss, and orthopedic problems.

7.      Mr. Kaplan graduated from American University ("AU") in 1999 with a bachelor of science degree in computer information systems. His undergraduate studies included courses in computer programming, database management, and applied systems design, among others.

8.      In 1998 and 1999, Mr. Kaplan completed two successful summer internships with the Department of Defense ("DoD"). Mr. Kaplan's duties during the 1998 internship included the evaluation and testing of school administrative software as well as the creation of several report templates to be used by DoD schools. His duties during the 1999 internship included the editing of computer-based multimedia presentations.

9.      In or about January 2000, Norma Hughes, a Human Resources advisor for NOAA at DOC, offered Mr. Kaplan a job at the DOC. In particular, she offered him a position in DUS, a division of NOAA. In offering Mr. Kaplan this position, neither Ms. Hughes nor anyone else

2

from DUS, NOAA, or DOC interviewed or met with Mr. Kaplan in person. All contact was by telephone and e-mail.

10. The position of Program Specialist that was offered to Mr. Kaplan placed him on the government pay scale at GS-301-07, step 1.

11. The duties of a Program Specialist of this level, as outlined in the position description offered to Mr. Kapan, include editing and reformatting electronic documents and presentations (often requiring graphics and tables); creating elementary macros to simplify and expedite assignments; developing training aids for use by office members; and performing troubleshooting of system and/or software problems encountered by staff.

12. Mr. Kaplan accepted the Program Specialist position and began working at DUS on February 14, 2000. Mr. Kaplan was placed under the direct supervision of Captain Richard Behn, Executive Director to the Deputy Under Secretary for NOAA.

13. Despite being qualified to fulfill the above-listed functions of his position as a Program Specialist at NOAA, Mr. Kaplan was not given such work. Instead, Captain Behn treated Mr. Kaplan not as an adult with a college degree in computer information systems, but rather as a small child. Captain Behn consistently assigned Mr. Kaplan to perform menial and physical tasks that did not involve any of the skills for which Plaintiff was hired, and that frequently, because of his disability, Mr. Kaplan could not perform, or could not perform in a timely manner or without great difficulty.

14. For example, Captain Behn assigned Mr. Kaplan to assemble a variety of papers and materials sent to DUS by other NOAA offices, hole punch that material, and then put it into three-ring binders. This task in no way utilized Mr. Kaplan's computer skills or his

3

qualifications as a Program Specialist at NOAA. Additionally, due to the effect of his disability on his fingers, Plaintiff lacks the manual dexterity to perform the task without great difficulty.

15. Similarly, on several occasions, Captain Behn directed Mr. Kaplan to transport computers and projectors between NOAA's facilities in Washington, DC and NOAA offices in Silver Spring, Maryland. Such activities fall outside of the duties of a Program Specialist, which are described as being "primarily sedentary, requiring no special physical demands" and which are to be "performed in a typical office setting." Moreover, these activities were made difficult due Mr. Kaplan's short stature and put dangerous strain on Mr. Kaplan's legs and back.

16. Further, on information and belief, Captain Behn himself assigned Mr. Kaplan, and allowed other NOAA employees to assign Mr. Kaplan, to tasks involving moving heavy equipment, photocopying, hanging posters, picking up packages outside of the office, making hotel reservations, and retrieving personal items.

17. The above-mentioned tasks assigned to Mr. Kaplan were not essential functions of the job for which he was hired. Indeed, Captain Behn seldom assigned Mr. Kaplan any tasks that utilized Mr. Kaplan's education, skills, or experience in computer information systems.

18. On multiple occasions throughout his employment, Mr. Kaplan, both orally and in writing, informed Captain Behn of the limitations caused by his disability. In addition, many of the limitations resulting from Mr. Kaplan's disability are obvious even to a casual observer. Despite possessing this information, Captain Behn required Plaintiff to undertake work that was incompatible with these limitations and did so without providing reasonable accommodations for Plaintiff's disability.

19. For example, Captain Behn typically assigned Mr. Kaplan his tasks orally. Mr. Kaplan reminded Captain Behn that he wrote slowly due to his condition and asked Captain Behn if he

4

could write down the tasks that he wanted Mr. Kaplan to perform or allow Mr. Kaplan a few extra minutes to write them down himself. Captain Behn refused this request.

20. Throughout Mr. Kaplan's employment at DUS, Captain Behn and others at NOAA directed humiliating comments and actions at Mr. Kaplan, which were based on his disability. For example, Mr. Kaplan was asked if he used "little furniture" at his home, and Captain Behn once physically took hold of Mr. Kaplan and wiped Mr. Kaplan's face and mouth, as if he were a small child.

21. On November 21, 2000, for the first time, Captain Behn provided Mr. Kaplan with a performance evaluation. At the same time, he told Mr. Kaplan that Mr. Kaplan would be terminated. Captain Behn would not address questions Mr. Kaplan asked concerning the evaluation; rather, Captain Behn told Mr. Kaplan that Captain Behn would be out of the office for the next three weeks, and that Mr. Kaplan would be gone from DUS by the time he returned.

22. On information and belief, Captain Behn subsequently recognized that termination of Mr. Kaplan was not justified, and that such termination would violate federal law barring discrimination on the basis of disability. Accordingly, Captain Behn set out to manufacture a record that could be used to justify the decision that had already been made to terminate Mr. Kaplan.

23. To this end, in mid-December 2000, Captain Behn assigned Mr. Kaplan to a 30-day detail at the Systems Division of NOAA.

24. For this detail, Mr. Kaplan was placed under the supervision of Ellis W. Rauch, Jr. From an initial review of Mr. Kaplan's resume prior to Mr. Kaplan's arrival, Mr. Rauch concluded that Mr. Kaplan's education had primarily dealt with computer programming, something that Mr. Rauch's office did not perform. Rather, the responsibilities of the Systems Division of NOAA

5

included the reconfiguration and upgrade of personal computers ("PCs"), which involved moving and lifting PCs, and physically dismantling hard drives from PCs with screwdrivers – work that required significant strength and manual dexterity.

25.     Like the tasks Mr. Kaplan had been assigned at DUS, these duties were not essential functions of the job for which Mr. Kaplan was hired.  Moreover, Mr. Kaplan's disability prevented him from being able to perform these duties, or made them very difficult to accomplish.

26.     At the conclusion of the 30-day detail, Mr. Kaplan's supervisor for the detail provided an evaluation of Mr. Kaplan's performance.  He noted that the detail required more strength and endurance than Mr. Kaplan had, and that Mr. Kaplan should not have been assigned to do that type of work.  Despite having to tolerate such an ill-suited assignment, the evaluation continued, Mr. Kaplan still exhibited a willingness to work and learn, was punctual, and interacted well with other team members.

27.     On information and belief, Captain Behn or others within DOC concluded that the evaluation of Mr. Kaplan's performance on the 30-day detail to the Computer Systems Office of NOAA was insufficient to create the kind of paper record that would justify the termination of Mr. Kaplan.  Accordingly, Captain Behn assigned Mr. Kaplan to a second detail, this one for two weeks at the High Performance Computing and Communications Office ("HPCC") in Silver Spring, Maryland.

28.     During the ten working days he spent at HPCC, Kaplan was assigned to a major project that was already in progress and about which he was given little to no orientation.  Although this work was not physical in nature (as it had been at DUS and in the first detail), it was still not

suited to his skills, education, and experience, and did not fall within the essential functions of the job for which Kaplan had been hired.

29.     At the conclusion of the second detail, Mr. Kaplan received a performance evaluation critical of his skills and abilities.  The evaluation was prepared by Susan Kennedy, Chief of the Business Process Analysis Division of the Information Technology Planning and Analysis Office in NOAA's Information Resource Management Office.

30.     Ms. Kennedy had not been Mr. Kaplan's direct supervisor during his time at HPCC and did not personally observe Mr. Kaplan's day-to-day activities.  Indeed, over the course of the two weeks that Mr. Kaplan worked at HPCC, he spent less than one hour speaking, meeting, reporting to, or otherwise dealing with Ms. Kennedy.  On information and belief, Ms. Kennedy was told that what was needed was an evaluation that would justify a termination, and she set out to draft just such an evaluation, despite a lack of any significant contact with Mr. Kaplan or awareness of his work.

31.     After the second detail was complete, Mr. Kaplan returned to work at DUS.  On February 5, 2001, Captain Behn informed Mr. Kaplan that his employment was being terminated as of February 9, 2001 – three days before Plaintiff would have completed his one-year probationary period.

32.     Mr. Kaplan was terminated from DUS on February 9, 2001.

33.     On information and belief, no one was hired to fill the position for which Mr. Kaplan had been hired.

34.     After approximately twenty-seven months of unemployment, Mr. Kaplan obtained a temporary federal appointment at the Department of Education that did not provide him with

7

healthcare benefits. This temporary position ended on April 1, 2005 due to budgetary constraints. Plaintiff received positive feedback on his performance during the appointment.

35. Defendant's actions have damaged Plaintiff with regard to earnings and job benefits, including, but not limited to, wages; pension; healthcare coverage; and other lost benefits.

36. Defendant's actions have also caused Plaintiff extreme mental anguish, emotional distress, and humiliation.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

37. On February 16, 2001, Plaintiff initiated administrative proceedings by filing a timely request for EEO counseling by contacting an EEO Counselor at NOAA.

38. On April 11, 2001, after the 30-day mandatory counseling period had passed, Plaintiff filed a formal complaint of discrimination on the basis of disability with the DOC's Civil Rights Office.

39. On February 20, 2003, DOC issued a final agency decision finding no discrimination against Plaintiff. Plaintiff received a copy of this decision on February 25, 2003.

40. On March 25, 2003, Plaintiff submitted a timely Notice of Appeal concerning his claim of discrimination on the basis of his disability with the Equal Employment Opportunity Commission ("EEOC") in Washington, DC.

41. The proceedings before the EEOC remain pending at the time of filing this Complaint, and have been pending for more than 180 days.

42. Plaintiff has exhausted his administrative remedies.

## COUNT I -- DISCRIMINATION ON THE BASIS OF DISABILITY

43. Mr. Kaplan realleges and incorporates by reference each and every allegation set forth above.

44. Mr. Kaplan is an individual with a disability, as defined by the Rehabilitation Act, in that he has achondroplasia, a physical condition that substantially limits one or more of his major life activities, including performing manual tasks; hearing; speaking; and breathing.

45. Mr. Kaplan is qualified to perform, with or without reasonable accommodation, the essential functions of the Program Specialist position for which he was hired.

46. Defendant has repeatedly and unjustifiably discriminated against Mr. Kaplan based on his disability by treating him as if he were a child and assigning him work that was not consistent with his job description, by subjecting him to humiliating comments and conduct, and by terminating him because of his disability.

47. As a direct and proximate cause of Defendant's unlawful discriminatory actions, Plaintiff has suffered injury, including past loss of income and benefits of employment; embarrassment; mental anguish; and indignity.

## COUNT II -- FAILURE TO PROVIDE REASONABLE ACCOMMODATIONS

48. Mr. Kaplan realleges and incorporates by reference the allegations set forth above.

49. Mr. Kaplan is an individual with a disability, as defined by the Rehabilitation Act, in that he has achondroplasia, a physical condition that substantially limits one or more of his major life activities, including performing manual tasks; hearing; speaking; and breathing.

50. Mr. Kaplan is qualified to perform, with or without reasonable accommodation, the essential functions of the Program Specialist position for which he was hired.

51. Defendant, DUS, and Captain Behn were all aware of Mr. Kaplan's disability and the limitations it imposed.

52. Mr. Kaplan made requests to Captain Behn to provide reasonable accommodations for his disability.

53. Defendant provided no accommodations for Mr. Kaplan's disability.

54. Defendant repeatedly and unjustifiably discriminated against Plaintiff by failing to provide him with reasonable accommodations, in violation of the Rehabilitation Act of 1973.

55. As a direct and proximate cause of Defendant's unlawful discriminatory actions, Plaintiff has suffered injury, including past loss of income and benefits of employment; embarrassment; mental anguish; and indignity.

## PRAYER FOR RELIEF

Wherefore, Plaintiff respectfully requests that the Court enter a judgment:

A. declaring that the Defendant has violated § 501 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 791 et seq.;

B. ordering the Defendant to reinstate Plaintiff in a position at DOC that is appropriate for Plaintiff's skills and abilities;

C. ordering the Defendant to expunge from Plaintiff's personnel record(s) all mention of his wrongful termination from DUS as well as any performance evaluations or other documents that criticized Plaintiff's work or effort during his time at DOC;

D. ordering the Defendant to make Plaintiff whole for all earnings and other job benefits he would have received but for Defendant's discriminatory treatment, including, but not limited to, wages; pension; health care; and other lost benefits plus pre-judgment and post-judgment interest;

10

E. awarding Plaintiff compensatory damages, including damages for his mental anguish and humiliation, in an appropriate amount;

F. ordering the Defendant to pay Plaintiff's costs, attorneys' fees, and expenses associated with this action; and

G. granting such other and further relief as this Court deems necessary and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury.

Respectfully submitted,

/s/ Jamie D. Underwood

Thomas M. Contois
DC Bar No. 464358
Jamie D. Underwood
DC Bar No. 471614
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, NW
Washington, DC 20036
202.429.3000

Susan E. Huhta
DC Bar No. 453478
WASHINGTON LAWYERS' COMMITTEE
FOR CIVIL RIGHTS AND URBAN AFFAIRS
11 Dupont Circle, NW, Suite 400
Washington, DC 20036
202.319.1000

COUNSEL FOR COMPLAINANT
DAVID N. KAPLAN

January 24, 2006

11